1

2                 IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF MISSOURI
3                          WESTERN DIVISION

4   UNITED STATES OF AMERICA,     ) Case No. 08-00113-01-CR-W-NKL
                                  )
5              Plaintiff,         ) Kansas City, Missouri
                                  ) February 4, 2009
6   v.                            )
                                  )
7   DEBRA PALMER,                 )
                                  )
8              Defendant.         )
    _____)

9

10            TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS
               BEFORE THE HONORABLE SARAH W. HAYS
11                UNITED STATES MAGISTRATE JUDGE

12
    APPEARANCES:
13
    For the Plaintiff:          Cynthia Cordes, Esq.
14                               AUSA
                                 400 E. 9th Street, Ste. 5510
15                               Kansas City, MO 64106
                                 (816) 426-3122
16
    For the Defendant:          Stephen C. Moss, Esq.
17                               Federal Public Defender's Off.
                                 818 Grand, Ste. 300
18                               Kansas City, MO  64106
                                 (816) 471-8282
19
    Court Audio Operator:       Ms. Dorothy Myers
20
    Transcribed by:             Rapid Transcript
21                               Lissa C. Whittaker
                                 1001 West 65th Street
22                               Kansas City, MO  64113
                                 (816) 822-3653
23
    Proceedings recorded by electronic sound recording, transcript
24  produced by transcription service.

25

1    (Court in Session at 1:36 p.m.)

2    THE COURT: All right. Good afternoon. We're here on

3 the case of *United States vs. Debra Palmer*, Case No. 08-113. If

4 counsel would state their appearance for the record.

5    MS. CORDES: Cynthia Cordes for the United States, Your

6 Honor.

7    MR. MOSS: Steve Moss for Ms. Palmer, Your Honor.

8    THE COURT: All right. We're here today on the Motion

9 to Suppress that was filed. Is everyone ready to proceed?

10    MS. CORDES: Yes, Your Honor.

11    MR. MOSS: Yes, Your Honor.

12    THE COURT: All right. How many witnesses do you have?

13    MS. CORDES: Your Honor, the Government has two

14 witnesses, Special Agent Brad Peterson with the FBI. He'll be

15 testifying first. And Special Agent Debra Michaels, also with

16 the FBI.

17    THE COURT: All right.

18    MS. CORDES: And I've asked Special Agent Michaels to

19 step outside during his testimony.

20    THE COURT: And then, Mr. Moss, do you know right now,

21 do you have any witnesses?

22    MR. MOSS: No, Your Honor.

23    THE COURT: All right. Then you may call your first

24 witness.

25    MS. CORDES: The United States calls Special Agent Brad

1    Peterson.

2              THE COURT:   All right.   Come forward and be sworn.

3                 BRAD PETERSON, GOVERNMENT'S WITNESS, SWORN

4                          DIRECT EXAMINATION

5    BY MS. CORDES:

6    Q.   Can you please introduce yourself to the Court?

7    A.   I am Special Agent Brad Peterson with the Federal Bureau of

8    Investigation.

9    Q.   And where do you work?

10   A.   At the FBI here in Kansas City.

11   Q.   And what squad are you assigned to?

12   A.   I'm part of the our Cyber Squad, and we have a Cyber Crimes

13   Task Force.

14   Q.   As part of your work on that squad, do you handle child

15   exploitation cases?

16   A.   I do.

17   Q.   Approximately how long have you handled child exploitation

18   cases?

19   A.   Almost three years.

20   Q.   And are you the case agent assigned to the investigation

21   against Todd Barkau and now Debra Palmer?

22   A.   Yes.

23   Q.   And were you the case agent involved in the investigation

24   from the commencement of the case?

25   A.   Yes.

1  Q.  And who is Debra Palmer in relation to the case?

2  A.  She is the mother of our primary victim.

3  Q.  The primary child victim?

4  A.  Yes.

5  Q.  And was the defendant, Ms. Palmer, did she live in the home

6  at the time the offenses were committed?

7  A.  Yes.

8  Q.  And as a part of your investigation, did you decide to

9  interview Ms. Palmer?

10 A.  Yes.

11 Q.  Did you conduct that interview on April 29th, 2008?

12 A.  Yes, I did.

13 Q.  And what was the purpose of that interview?

14 A.  To get information from Ms. Palmer, any information she might

15 have about any of those activities that I was investigating.

16 Q.  And at the time you conducted the interview, was Ms. Palmer a

17 target of a grand jury investigation or was she considered just a

18 witness involved in the investigation against Todd Barkau?

19 A.  At this point, she was a witness.

20 Q.  And on April 29th, 2008 when you decided to approach Ms.

21 Palmer for the interview, where was she residing?

22 A.  At her residence.

23 Q.  And where was that?

24 A.  In Dallas, Texas.

25 Q.  And did you fly from Kansas City to Dallas to conduct the

1  interview?

2  A.   Yes, I did.

3  Q.   And who conducted the interview with you?

4  A.   Special Agent Debra Michaels from the Dallas division office.

5  Q.   And why was she involved?

6  A.   It's standard procedure that we always have someone else go

7  with us when we do one of these interviews.  And since I was

8  flying in, I requested an agent at the local office to go with

9  me.  She works these cases as well, so she has experience with

10 them, and that's why they selected her to go with me.

11 Q.   And were there any other agents present besides you and

12 Special Agent Michaels?

13 A.   No.

14 Q. And does Ms. Palmer, at that particular day that you were

15 going to conduct the interview, what type of residence does she

16 live in?

17 A.   It was an apartment.

18 Q.   An apartment in an apartment complex?

19 A.   Yes.

20 Q.   And where was that located?

21 A.   In Dallas, Texas.  I can look up the address if you need it

22 here.

23 Q.   No, that's not necessary.  But it was inside Dallas, Texas,

24 so in that area?

25 A.   I believe it was in Dallas, Texas, or a suburb, but I believe

1  it was Dallas, Texas.

2  Q.  And were you planning on approaching Ms. Palmer at her

3  residence?

4  A.  Yes.

5  Q.  And what were you wearing that day on April 29th before the

6  interview, during the course of the interview?

7  A.  Business attire.

8  Q.  Were you wearing any law enforcement attire or SWAT clothes?

9  A.  No.

10  Q.  And did you have a marked vehicle or unmarked vehicle?

11  A.  Unmarked.

12  Q.  Approximately, what time did you arrive at her apartment?

13  A.  We got there originally about 7:00 that night.

14  Q.  And why did you arrive at 7:00 p.m. that evening?

15  A.  We had some intelligence that she would be getting off work

16  about 8:00 p.m., so we wanted to get there a little earlier in

17  case she came home early.

18  Q.  And where does she work?

19  A.  It's a --

20  Q.  Let me ask you, what does she do for a living?

21  A.  She works ambulance -- at an ambulance company.  I believe

22  she's an EMT of some kind, but she works for, I think it was

23  Guardian Ambulance at the time.

24  Q.  And when 8:00 p.m. rolled around, did Ms. Palmer arrive at

25  the residence?

1   A.   No, she was not there.

2   Q.   And what did you do after she didn't arrive?

3   A.   Special Agent Michaels and myself parked in the parking lot

4   and just basically waited for her to come home.

5   Q.   And why did you choose to wait as opposed to coming back next

6   week?

7   A.   Well, one, I had flown in for this.  And so, since I was

8   there, I wanted to be able to do my very best to interview her

9   while I was in town.

10  Q.   Did you have any other matters pending in Dallas?

11  A.   No.  No, I went there for that sole purpose was to interview

12  her.

13  Q.   And so you waited outside the residence with Special Agent

14  Michaels until she arrived?

15  A.   Yes.

16  Q.   And approximately, what time did she arrive at her apartment?

17  A.   I would say 11:00, 11:15 approximately.

18  Q.   And how do you know that?

19  A.   That's because we were there the whole time except for the

20  very end.  At approximately 11:00 we decided to go get a restroom

21  break and grab a soda, and just probably spent maybe ten or

22  fifteen minutes doing that.  And then we came back to do one last

23  check to see if she had arrived, her car was in the parking lot.

24  Q.   And what time approximately was that?

25  A.   I believe that was around 11:15.

1  Q.  And after you arrived at 11:15, how did you go about

2  approaching the apartment?

3  A.  I first initially gave her a call because I did have her

4  phone number, and I didn't want to alarm her if I didn't have to.

5  And so, but there was no answer.  So, we went and knocked on the

6  door.

7  Q.  Okay.  Did she answer the door?

8  A.  She did.

9  Q.  And after she answered the door, how did you identify

10 yourself?

11 A.  I said something to the effect that I am Special Agent Brad

12 Peterson with the FBI.  I'm investigating a matter and I believe

13 that you might have some information related to that case, and

14 so, we were wondering if we could come in and talk with you about

15 that.

16 Q.  And did Special Agent Michaels introduce herself as well?

17 A.  Either she did or I introduced her as also being with the

18 FBI.

19 Q.  And after identifying yourself, did Ms. Palmer invite you

20 inside the house?

21 A.  She did.

22 Q.  Did you tell her at that time that if she chose to talk to

23 you that -- what did you tell her about whether she'd be arrested

24 or not?

25 A.  I specifically told her there that we were just there to talk

to her, that specifically that we weren't there to arrest her or

anything like that.  We appreciated her cooperation.  We needed

her help and that in speaking with us, it was voluntary.  And

when we got done talking with her, Agent Michaels and I would

leave, and you know, we would not be taking her into custody for

any reason.

Q.  So, she was told by you and Special Agent Michaels that she

wouldn't be placed under arrest that evening?

A.  Correct.

Q.  And after being told that, did she still agree to talk with

you that evening?

A.  She did.

Q.  And in the course of the interview, where were you located in

the apartment?

A.  We were in like her living room area.  I think she was on a

couch, and we were sitting on a couple of chairs around like a

coffee table.

Q.  Before you began the interview when you first arrived in the

apartment, did you have an opportunity to discuss with Ms. Palmer

whether she had taken any medication that evening?

A.  Yes.

Q.  And what was her response to those inquiries?

A.  That she had only taken a couple of ibuprofen and that does

not affect her at all.

Q.  And when you looked around the apartment, did you see any

1  medication or drugs in sight?

2  A.  No.

3  Q.  And did you have an opportunity to ask her whether she had

4  had any alcohol that evening?

5  A.  I believe Agent Michaels asked her that.  And I think I did

6  too myself actually.  And I was satisfied that she had not been

7  drinking.

8  Q.  Did she indicate to you that she had had any alcohol or do

9  you recall?

10 A.  I don't recall anything.  Either she said she had not any or

11 it was so minimal that I knew it wasn't an issue.  But I think

12 she said she did not have any.  I just knew I was satisfied that

13 it was not an issue.

14 Q.  She was not intoxicated?

15 A.  Correct.

16 Q.  Okay.  So, in your opinion, she did not appear intoxicated

17 that evening?

18 A.  Correct.

19 Q.  Did she smell intoxicated?

20 A.  No.

21 Q.  Did she sound intoxicated?

22 A.  No.

23 Q.  When you looked around the apartment, did you see any alcohol

24 in sight?

25 A.  No.

1   Q.   When you asked her questions, did she seem to respond
2   coherently?
3   A.   Yes.
4   Q.   Did she seem to understand the questions that you asked her?
5   A.   Yes.
6   Q.   Did she seem to suffer from any type of mental deficiency?
7   A.   No.
8   Q.   Approximately, how long did you speak with her that evening?
9   A.   I think it was about two and a half hours.
10  Q.   And during the course of that two and a half hours, could Ms.
11  Palmer have asked you to leave at any time?
12  A.   Yes.
13  Q.   Did she?
14  A.   No.
15  Q.   Could she have asked you to come back a different day?
16  A.   Yes.
17  Q.   Did she do that?
18  A.   No.
19  Q.   During the course of the interview when you were speaking
20  with Ms. Palmer, did she ever ask for an attorney?
21  A.   No.
22  Q.   Did she ever ask you if she needed an attorney?
23  A.   No.
24  Q.   And if she had, hypothetically, would your answer have been
25  no?

1    A.   No.   It's --

2    Q.   What would it have been?

3    A.   We're trained not to answer that way.   We're trained to say

4    we can't provide legal advice.   I can't advise on that, that sort

5    of thing.

6    Q.   During the course of the interview, while you were inside her

7    apartment, was Ms. Palmer able to move freely around her home?

8    A.   Yes.

9    Q.   And why do you say that?

10   A.   Well, when we got there, she was preparing her lunch for the

11   next day, and we allowed her to basically finish that up before

12   we started the interview.   And at one point, she needed to use

13   the bathroom, and you know, she was able to do that.

14   Q.   And was she able to walk around as she talked with you or go

15   to the bathroom if she needed it?

16   A.   She could have if she wanted to.   For the most part, we just

17   sat there, but she could have if she had wanted to.

18   Q.   During the course of the interview, did you make any promises

19   to Ms. Palmer?

20   A.   No.

21   Q.   Did you promise her that she wouldn't be charged?

22   A.   No.

23   Q.   Did you promise anything of any type for a leniency?

24   A.   No.

25   Q.   Did you tell Ms. Palmer any lies in the course of the

1  interview?

2  A.  No.

3  Q.  At the end of interview, did you place Ms. Palmer under

4  arrest?

5  A.  No.

6  Q.  Did you tell her that she would be arrested at a later time?

7  A.  No.

8  Q.  And at that time, was there any arrest warrant issued for

9  her?

10  A.  No.

11  Q.  What happened at the conclusion of the interview?  How did it

12  end?

13  A.  Basically saying thank you for your cooperation in agreeing

14  to talk to us, you were very helpful.  If I -- after I go through

15  all of this, if I have some follow-up questions, is it okay if I

16  give you a call, ask those questions.  She said that would be

17  fine.  We also asked her -- I told her that if she thinks of

18  anything else along the lines of what we've talked about after we

19  left, that she was free to call me and provide me that

20  information.  I gave her my business card so that she could

21  contact me.  And we asked her if she had any questions for us.

22  Q.  Do you recall if she mentioned an attorney at the end of the

23  interview?

24  A.  I don't specifically recall her asking that.  She may have

25  inquired at the end there, if it would be a good idea or not.  I

1  can't remember for sure.

2  Q.  And if she had inquired whether it would be a good idea or

3  not to have an attorney, what would your answer have been?

4  A.  That we can't advise her on that sort of thing.

5  Q.  After the interview that night, did Ms. Palmer contact you

6  any time later?

7  A.  She did.

8  Q.  How long afterwards?

9  A.  It was on May 2nd, so, a --

10 Q.  It was a few days afterwards?

11 A.  Yes, within some days.

12 Q.  And she initiated that contact?

13 A.  Yes.

14 Q.  And what was the contact?

15 A.  She called me at the -- at my office.

16 Q.  And when she called you at your office, did she continue to

17 make additional statements during the course of that

18 conversation?

19 A.  She did.

20         MS. CORDES:  Nothing further at this time, Your Honor.

21         THE COURT:  All right.  Mr. Moss, you may cross-examine.

22         MR. MOSS:  Thank you, Your Honor.

23                         CROSS-EXAMINATION

24 BY MR. MOSS:

25 Q.  I see you have referred briefly to a report up there.

1  A.  Yes.

2  Q.  Is that your 302 --

3  A.  It is.

4  Q.  -- report?

5  A.  It is.

6  Q.  Okay.  And there are actually two 302s that you've prepared?

7  A.  Yes.

8  Q.  All right.  Is it fair to say that you were the lead

9  investigator in this case?

10 A.  Yes.

11 Q.  And Agent Michaels, she was there because she's worked on

12 cases of this nature before?

13 A.  Yes.

14 Q.  Is she stationed somewhere in Texas?

15 A.  Yes, at the Dallas office.

16 Q.  All right.  And when you arrived at Ms. Palmer's apartment,

17 you indicated to her that you needed her help?

18 A.  Yes.

19 Q.  And did you tell her you were investigating allegations

20 involving her daughter?

21 A.  At some point, I'm sure I did.

22 Q.  Okay.  Was that at the very beginning when you were

23 explaining why you needed her help?

24 A.  It probably was.  It was either -- I can't remember if I said

25 it at the door or right shortly after she let us in, but it was

1   at the, fairly at the beginning when we started to talk.

2   Q.  Okay.  And did you mention the name Todd Barkau, allegations

3   that her daughter had made against Todd Barkau?

4   A.  Yes.

5   Q.  All right.  And you communicated that you were there

6   basically looking for help in investigating these allegations?

7   A.  Yes.

8   Q.  I think, did you inform Ms. Palmer that she was a witness,

9   you thought she was a witness to some of these events?

10  A.  Yes, I told her that I -- it was my understanding that she

11  may have some information regarding the case and I wanted to talk

12  to her about what she might know.

13  Q.  You also, I think, indicated that you told Ms. Palmer she was

14  not in custody?

15  A.  That's right.

16  Q.  Did you actually use the term "in custody" or did you say

17  that you're not under arrest?

18  A.  I used both.

19  Q.  And why did you tell her that she wasn't in custody or under

20  arrest?

21  A.  Because I wanted to make sure it was clear in her mind that

22  this was a non-custodial situation.

23  Q.  Is part of the reason to convince her that she was only a

24  witness as opposed to a suspect?

25  A.  It wasn't really to convince her, you know, either way.  I

1  just wanted to be able to talk to her and create a non-custodial

2  environment.

3  Q.  I think you indicated that at the time your meeting with her,

4  she was not a target of the investigation.  Is that accurate?

5  A.  I don't know if I told her that she was not a target.

6  Q.  All right.  Let me clarify.  You've testified, though, at

7  this time she was a witness rather than a target at the time you

8  approached her?

9  A.  Right.  She had not been indicted or anything like that at

10  this point.

11  Q.  Okay.  And I guess I'm going to distinguish between someone

12  that's been indicted --

13  A.  Uh-huh.

14  Q.  -- and someone that's a target meaning someone who's seeking

15  to gather information upon --

16  A.  Uh-huh.

17  Q.  -- possibly make a case, right?

18  A.  Sure.

19  Q.  So, when you go this evening to speak with Ms. Palmer, she's

20  not a target at that time?

21  A.  There were some allegations that were made that -- against

22  her mom or against Ms. Palmer, and I just wanted to know if any

23  of those information -- if that information was true as well.

24  Q.  I guess -- can you say if she was a target of the

25  investigation or not at the time you went to go speak with her?

A.  I was following up on the allegations that were made against

her.  Whether or not that is -- constitutes -- I mean, it could

be just semantics here.  To me, target is a term of art that I

can't -- I don't think of it that way in my mind.  So, I'm just

trying to articulate.  It was mainly just -- I was trying to

follow-up on certain allegations.

Q.  But I guess my question is if she's, if she is possibly a

target or someone that could be indicted or charged, isn't that

different than being just a witness in a case?  Do you see

distinctions between those?

A.  Well, in this instance, I was interested in information that

she had.  So, I just wanted information from her.  That's why I

was there.

Q.  You believed she was maybe both a witness and a target.  Is

that a fair statement?

        MS. CORDES:  Your Honor, I'm going to object at this

point.  Some of this is going to be outside the scope of the

witness's knowledge.  The U.S. Attorney's Office is the one

that's leading the grand jury investigation and is going to

decide whether --

        THE COURT:  Well, he's indicated that "target" is a term

of art to him.  Maybe you need to get him to define what he means

by a term of art.

BY MR. MOSS:

Q.  All right.  I think I'd like just to go back to your direct

1  testimony.  Did you not testify that you were interested in Ms.

2  Palmer's information as a witness?

3  A.  Yes.

4  Q.  And what you're also saying is that she may have also been

5  involved based on some allegations, right?

6  A.  That's true.

7  Q.  Did you communicate that to Ms. Palmer?

8  A.  I did not communicate that I believed she was involved.

9  Q.  Okay.  And that's -- I think that's the distinction I was

10 looking for.

11 A.  Okay.

12 Q.  Prior to this meeting, had you equipped her daughter with the

13 recording device?

14 A.  Yes.

15 Q.  So, at least for some period of time, her daughter had been

16 recording the phone conversations with Ms. Palmer?

17 A.  Yes.

18 Q.  All right.  And this interview with Ms. Palmer occurred on,

19 is it April 29th of '08?

20 A.  Yes.

21 Q.  And I believe the 302 indicates it was transcribed on May 5th

22 of '08?

23 A.  Yes.

24 Q.  And it's signed by two agents, yourself and Ms. Michaels?

25 A.  Yes.

1  Q.  Agent Michaels?

2  A.  Uh-huh.

3  Q.  Who actually transcribed the 302 Report?

4  A.  I wrote the report.

5  Q.  And you wrote it -- did you write it on May 5th?

6  A.  Yes.

7  Q.  Were you in Kansas City when you wrote it?

8  A.  Yes.

9  Q.  All right.  And what did you base your 302 Report on?

10 A.  The interview that I had with Ms. Palmer.

11 Q.  Okay.  Was it based on notes --

12 A.  Yes.

13 Q.  -- that you took?

14 A.  Uh-huh.  Yes.

15 Q.  And was it also based on your memory of the event or was it

16 solely limited to the notes your took on the interview?

17 A.  Almost entirely my notes.  Occasionally you remember

18 something, little bits and pieces here and there.  But I take

19 good -- I had good notes on it.

20 Q.  All right.  Were you the only agent that took notes or did

21 Ms. Michaels take notes as well?

22 A.  You'd have to ask her to make sure, but I don't think she

23 took notes.  I think it was just me.

24 Q.  All right.  When you wrote your report, you relied upon your

25 notes?

1   A.   Right.

2   Q.   And do you still have your notes?

3   A.   Yes.

4   Q.   I noticed that the signature, the 302 is signed by both -- or

5   it looks like it's initialed by both you and Agent Michaels.

6   A.   Yes.

7   Q.   Did you fax it to Ms. Michaels?  I mean, I assume she was

8   still in Texas.  How did she review the report?

9   A.   I sent her a hard copy by our internal mail service.

10  Q.   And then she just says I'm fine with that or did she make any

11  corrections?

12  A.   She reviewed it and she -- yeah, she agreed with the content

13  and initialed it.

14  Q.   She didn't make any corrections to your report?

15  A.   No.

16  Q.   All right.  I think you've testified you arrived there

17  initially at Ms. Palmer's residence about, was it 7:00 p.m. or?

18  A.   Seven p.m.

19  Q.   And you had information that she would be off of work a

20  little bit before then?

21  A.   Yes.

22  Q.   And apparently, you didn't actually -- she didn't get off

23  until -- arrive at the residence until a little bit after 11:00.

24  Is that right?

25  A.   That's right.

1    Q.  And you approached -- you tried to call her apartment first?

2    A.  Yes.

3    Q.  And then you went and knocked on the door about 11:15?

4    A.  Yes.

5    Q.  And you interviewed Ms. Palmer for about two and a half

6    hours?

7    A.  That's right.

8    Q.  So, I guess you left a little bit before, about 1:45?

9    A.  Yes, approximately.

10   Q.  Okay.  Would you describe the interview you had with Ms.

11   Palmer as a conversation?

12   A.  It was pretty close to a conversation.  It was -- it was not

13   an interrogation by any extent.  It was mainly I had a lot of

14   information that I just wanted to see if she had any information

15   about.  I asked her a series of questions.  She provided us

16   answers.

17   Q.  Did Agent Michael, did she participate in the questioning of

18   Ms. Palmer as well?

19   A.  She did.  And it's Michaels with an S at the end.

20   Q.  Michaels?

21   A.  Yeah.

22   Q.  So, what was the extent of -- I mean, was it pretty much a

23   50/50 question?  Did you divide up questions pretty much 50/50

24   with both you and Agent Michaels questioning Ms. Palmer about

25   equally or?

A.   No, I was doing the primary questioning.

Q.   But she did jump in occasionally and ask questions as well?

A.   Yes.

Q.   All right.  And it's fair to say that most of the report does not document any of the questioning, the questions that you asked Ms. Palmer?

A.   Right.  I mean, other than -- I mean, what I have in my report is a summary of our interview.

Q.   All right.  And is it fair to say that that summary of the interview is primarily a summary of Ms. Palmer's responses to whatever questions were asked?

A.   I mean, I believe I may have listed questions where appropriate, but it is.  It's mainly responses, summaries of her information that she provides, yes.

Q.   All right.  And the report does not document what questions you asked versus what questions Agent Michaels --

A.   No, not every question.  Yeah, it's not a transcript of the actual whole thing.

Q.   Is the report in chronological order?  Were the responses given in the order in which they're composed by you in your 302?

A.   I'd have to -- I tried to do that as much as possible, but because there was some kind of jumping around, a lot of times I would try to group topics together.  I try to keep the topics together.  Sometimes that would come, like additional information later in the interview about a particular topic, so I would --

Q.  Okay.

A.  Do you see what I'm saying?

Q.  So, if later on in like hour two --

A.  Uh-huh.

Q.  -- she mentions something that related back to something that was discussed in the first 30 minutes, you might group that information in the section when you first --

A.  Possibly, unless I felt it would have been appropriate to put it in the back for some reason.

Q.  Is it fair to say that throughout this interview, either you or Agent Michaels do convince Ms. Palmer to make certain admissions?  Is that a fair statement?

A.  I don't know if convince is the right word.  We asked her questions, and she provided statements, and I would consider some of the things she said to be incriminating.

Q.  All right.  If you could look at page 2 of your 302, the first paragraph.

A.  Okay.

Q.  The second sentence of that, your 302 -- this is the 302 from the initial interview.

A.  Yes.

Q.  Do you see where it says, "Palmer eventually admitted she knew that (Juvenile) started sleeping in Barkau's bedroom"?

A.  Right.

Q.  And, I guess my question is, you say she "eventually

1  admitted." Is it fair to say that she admitted based on some

2  type of questioning or persuasion that you or Agent Michaels

3  provided to her?

4  A.  Well, she eventually admitted, because for a while she was

5  denying it throughout the interview.  And I was certain that that

6  was not the truth.  And so, I would bring that question up

7  routinely throughout the interview.  And I might say, I don't

8  know if you're being honest with me about this, you know, that

9  sort of thing.  And I would reask the question again, and

10  eventually towards the end of the interview, she admitted that

11  she knew that.

12  Q.  So, I mean, you would simply suggest that, and would it just

13  be repetition you suggested that you thought she did have

14  knowledge that they shared a bedroom?

15  A.  Yeah, repetition and I would just basically say that I just

16  didn't think that she was being honest with me when she said she

17  had no knowledge of that.

18  Q.  Do you have any memory of how many times you had to repeat

19  this or address this subject with her before she made that

20  admission?

21  A.  I don't know how many times it was, but I just, I really

22  don't know.  It wasn't like we, you know, were going over and

23  over and over about it.  But it was just one of those things

24  where it was asked her multiple times but not, I think, an

25  excessive amount.

1  Q.  Okay.  And I guess if we go down to the third paragraph, this

2  is kind of the same issue but a different subject.

3  A.  Uh-huh.

4  Q.  You indicate that she eventually admitted that she was aware

5  that Barkau and her daughter were having a sexual relationship.

6  A.  Yes.

7  Q.  So, --

8  A.  The same type of thing.

9  Q.  At some point you repeated or acknowledged, either you or

10 Agent Michaels indicated that you thought that she acknowledged

11 it --

12 A.  Well, based on some of the --

13 Q.  -- the relationship?

14 A.  Yes.  And part of it is based on some of the things that

15 she's telling us, you know, just her living there, her having

16 knowledge of everything.  It's just, it's just really basically

17 saying it's just not believable, you know, that she didn't know

18 that this stuff was going on.  So, part of it was based on some

19 of the things that she was telling us, and so, we're responding

20 to that.  And other times, we just didn't believe her, and we'd

21 bring it up a couple of other times.

22 Q.  Let me move to page 3 of your 302.

23 A.  Okay.

24 Q.  If we look at the bottom, next to the last paragraph, it

25 says, "Palmer eventually realized (Juvenile) was having live

1  sessions with customers."

2  A.  Yes.

3  Q.  Did she indicate how she made this realization or was that a

4  suggestion of you or Agent Michaels?

5  A.  No.  I mean, we basically -- we talked about it.  And I think

6  it's summarized in my report basically some of the things that

7  she would observe and talk about.  And she basically, and again,

8  we would just say, initially she claimed to have, you know, some

9  ignorance of these things, but we just, we said, you know, based

10 on what you've told us, based on what we know, that just doesn't

11 sound right.  And then eventually, she would admit that she was

12 aware of these things.

13 Q.  All right.  I know you were expecting Ms. Palmer earlier in

14 the evening.  Did Ms. Palmer appear tired or fatigued during the

15 interview?

16 A.  No.  I mean, she was actually a little anxious.  I mean, you

17 know, the FBI comes by, and we're used to that.  And once we

18 started talking about it, got into the interview, you know, it's

19 a -- it's kind of a very intense, I think, personal thing for

20 their family.  And I think she was very awake and very alert, you

21 know, for the interview.

22 Q.  All right.  And that's at least based in part on the fact

23 that there were two FBI agents show up at her house?

24 A.  Sure.  And that's usual.

25 Q.  Did you ask her about her work schedule?

1  A.   We talked about it.

2  Q.   Did she indicate she had just worked a 14-hour shift to you?

3  A.   I can't remember the number of hours, but I do know she had

4  worked a long shift.

5  Q.   And did she ever mention drinking to unwind after she got off

6  that shift?

7  A.   No.

8  Q.   And in your view, she did not -- well, you did ask about

9  medication, right?

10 A.   Yes.

11 Q.   Did you ask about alcohol, whether or not she had been

12 drinking?

13 A.   Yes.

14 Q.   That's not documented in the 302 anywhere, is it?

15 A.   I don't think it is specified alcohol.  I think in the area

16 where I was talking about the medication, I think I was kind of,

17 I think I was in my mind I was just kind of grouped it all

18 together, but I didn't break it apart.

19 Q.   So, you did ask about both medication and alcohol?

20 A.   Yes.

21 Q.   And in your view, she did not appear disoriented or confused

22 during that two and a half hour --

23 A.   Right.

24 Q.   -- span of time?

25 A.   That's correct.

1  Q.  All right.  She did, however, get mixed up several times?

2  A.  What do you mean?

3  Q.  If you look at page 6, one, two, three, the fourth paragraph

4  down, at least if it looks like the 302 is reading that Palmer

5  was getting some events mixed together or nights mixed together?

6  A.  Yes.  And I think that was just, this happened several years

7  ago, and it's understandable that, you know, there's a couple

8  events that, you know, she might be getting the, you know, some

9  of the events on these occasions blended together.

10 Q.  Okay.  So, when this interview happened in 2008, she'd be

11 talking about events that occurred how many years ago?  Three,

12 four years ago?

13 A.  Let's see.  2000 -- I think it started around in 2002, 2003,

14 2004 and 2005.

15 Q.  Four, five years ago?

16 A.  Up to, yeah.

17 Q.  So, and in your view, whatever confusion of her being mixed

18 up had to do with trying to recall events that occurred --

19 A.  Yeah, that's --

20 Q.  -- four or five years ago?

21 A.  Yes.

22 Q.  And it didn't have anything to do with alcohol?

23 A.  Oh, absolutely not.

24 Q.  Had nothing to do with her being fatigued after working a

25 long shift?

1   A.   No.

2   Q.   Now, at the conclusion of the interview, you told Ms. Palmer

3   not to contact her daughter.

4   A.   I asked her not to, yes.

5   Q.   Okay.  Why did you instruct her not to contact her daughter?

6   A.   Basically, I believe that was what I had discussed with the

7   AUSA, and I don't actually remember the reason why, but I

8   remember that's just -- I think we didn't want our witness, I

9   think, to be manipulated because it is her mother.  And sometimes

10  in these situations, when you have a family situations, you've

11  got a family, like a mom that will, you know, try to get the

12  daughter to change her story and that kind of thing.

13  Q.   And to your knowledge, did Ms. Palmer ever try to contact her

14  daughter?

15  A.   No.

16  Q.   So, is it fair to say that she respected your authority

17  and --

18  A.   She did.  As far as I know, yes.

19  Q.   And I think you indicated at the end of the interview, you

20  told Ms. Palmer that she had been very helpful?

21  A.   Yes, she had been.

22  Q.   Is that accurate?  I mean, was she helpful to you?

23  A.   Yes.

24            MR. MOSS:  Could I have one second, Your Honor?

25            THE COURT:  Sure.

1  BY MR. MOSS:

2  Q.  The only other issue, I think you indicated at the conclusion

3  of the interview --

4  A.  Uh-huh.

5  Q.  -- there may have been some discussion with Ms. Palmer

6  regarding an attorney or needing an attorney?

7  A.  Right.

8  Q.  You're not sure about that?

9  A.  I'm really fuzzy on that one, but, so I can't say I recall it

10 specifically.  But at the end, it's possible, if that's where --

11 if she raised the question, that's a point where sometimes people

12 ask at the conclusion of an interview like that.

13 Q.  And if she had requested or mentioned an attorney, do you

14 have a particular response or do you know what the response would

15 have been?

16 A.  Yeah.  We're trained to say that we can't give legal advice.

17 We can't advise you in that area.  And that's basically what we

18 say to it.

19 Q.  All right.  And I know you've probably read the *Miranda*

20 rights to suspects when they are under arrest or in custody, --

21 A.  Sure

22 Q.  -- right?  And at the beginning of the interview, are you

23 telling Ms. Palmer that she's not in custody and not under arrest

24 just so you don't have to read those *Miranda* rights?

25 A.  Well, that's one reason, but that's not the only reason.

1  Q.  What's the other reason?

2  A.  Just to create a more informal environment where she feels

3  more comfortable in talking.

4  Q.  All right.

5        MR. MOSS:  I think that's all the questions I have.

6  Thank you.

7        THE WITNESS:  Yeah.

8        MS. CORDES:  Just a few follow-up questions, Your Honor.

9                    REDIRECT EXAMINATION

10 BY MS. CORDES:

11 Q.  Special Agent Peterson, you testified that you documented

12 incriminating statements from Ms. Palmer made that night to you

13 in your 302?

14 A.  Sure.

15 Q.  Did Ms. Palmer also make many self-serving statements that

16 evening?

17 A.  She did.

18 Q.  Did you document those in your 302 as well?

19 A.  I did.

20 Q.  And just to be clear, when you arrived at the apartment, Ms.

21 Palmer invited you inside her residence?

22 A.  Yes.

23 Q.  And you told her she wasn't under arrest?

24 A.  Correct.

25 Q.  And you never at any time placed her under arrest?

1  A.  Correct.

2  Q.  And when you arrived in the residence, was there anything

3  that indicated to you that Ms. Palmer had been drinking?

4  A.  No, nothing.

5  Q.  And again, just to be clear, did she sound intoxicated?

6  A.  No.

7  Q.  Look intoxicated?

8  A.  No.

9  Q.  Was any alcohol around in the residence?

10 A.  No.

11 Q.  And did you ask her if she had been drinking?

12 A.  Yes.

13 Q.  And what was her response?

14 A.  She either said either nothing or it was so minimal that it

15 was not an issue for me.

16 Q.  And you just testified regarding one of the statements in

17 your 302 where Ms. Palmer told you a couple of the evenings that

18 she was discussing, she got mixed together.

19 A.  Uh-huh.

20 Q.  Did you ask her just about events that happened five years

21 ago or did you actually ask her about events that happened for

22 the entire continuation of the criminal offenses?

23 A.  I asked her about everything, you know.

24 Q.  And so, how many years did that go back?

25 A.  It goes back, I don't know how many years it goes back.  The

1  first time she met this guy was probably over ten years ago, I'm

2  sure.

3  Q.  At least?

4  A.  I can't remember, but it was a long time ago.

5  Q.  Did you ask her about times when the child was actually still

6  in diapers?

7  A.  That's right, yes.

8  Q.  And at the end of the interview -- well, let me ask you this.

9  At any point during the course of the interview, did she ask you

10 for an attorney?

11 A.  No.

12 Q.  At any point in the course of the interview, did she say that

13 she asked you if she needed an attorney?

14 A.  No.

15 Q.  Okay.

16         MS. CORDES:  Nothing further, Your Honor.

17         MR. MOSS:  Just a few questions, Your Honor.

18         THE COURT:  All right.

19                        RECROSS EXAMINATION

20 BY MR. MOSS:

21 Q.  I think you indicated on redirect examination that Ms.

22 Palmer's response to the question of alcohol consumption was

23 either nothing or so minimal it wasn't worth noting in your

24 report?

25 A.  Right.

1  Q.  Okay.  Is it fair to say you don't recall her exact response?

2  A.  I don't recall her exact response.

3  Q.  Do you recall her mentioning a mixed drink Nerds?

4  A.  No, I would have remembered that.  No.

5  Q.  Okay.  What about Crown and Coke or beer?

6  A.  No.

7  Q.  So, no recollection of --

8  A.  No recollection of any specific drinks at all.

9  Q.  Okay.

10 A.  I certainly would have remembered that.  I would have noted

11 that.

12 Q.  All right.

13          MR. MOSS:  That's all I have.

14          MS. CORDES:  Just one question, Your Honor.

15                   FURTHER REDIRECT EXAMINATION

16 BY MS. CORDES:

17 Q.  Special Agent Peterson, if she had listed off specific

18 alcoholic drinks that she consumed that evening, is that

19 something you would have noted and included in your report?

20 A.  Absolutely.

21          MS. CORDES:  Nothing further, Your Honor.

22          THE COURT:  Anything further, Mr. Moss?

23          MR. MOSS:  No, Your Honor.

24          THE COURT:  I just have a couple of questions.

25 EXAMINATION BY THE COURT:

1  Q.  You flew from Kansas City all the way to Dallas to interview

2  her?

3  A.  I did.

4  Q.  Was there any reason you didn't make an appointment with her

5  before you just went down there unannounced?

6  A.  I think, it's kind of a strategy call in some of these

7  situations.  Since it is involving this case and her daughter,

8  you know, if I'd made an appointment in advance, I was afraid

9  that she might contact, you know, our victim in this case and

10 basically, try to use her motherly, I guess, relationship to try

11 to influence, get her to change her testimony.  We thought it was

12 best to just kind of just show up.

13 Q.  And your information was that she'd be getting off work at

14 8:00?

15 A.  Yes.

16 Q.  And when she didn't arrive home until 11:00, did you make any

17 inquiry about where she had been between 8:00 and 11:00?

18 A.  We did.

19 Q.  And what did she tell you?

20 A.  She said she was playing pool.  She had stopped somewhere to

21 play some pool.

22 Q.  Did she say anything else about what she'd been doing in that

23 time period?

24 A.  No.  And also, too, when she mentioned pool, I'm also certain

25 too that I would have asked her, you know, did you drink while

1   you were at this place playing pool?  And I'm satisfied that she

2   did not.  And she drove home.

3   Q.  Now, there was a series of questions that you may recall

4   about whether or not at the time you went down there Ms. Palmer

5   was a target.  Do you remember those questions and answers --

6   A.  Yeah.

7   Q.  -- earlier?

8   A.  Yes, Judge.

9   Q.  And you did indicate at that time that in your mind "target"

10  was a term of art.

11  A.  Uh-huh.

12  Q.  And what does that mean to you?

13  A.  To me target is someone who, basically, is -- we've decided

14  that we're opening up an investigation on this person.  And in

15  this case, we just had some allegations.

16  Q.  So, in this case you had allegations that Ms. Palmer was

17  involved?

18  A.  Yeah, I mean, possibly had been involved.

19          THE COURT:  All right.  Any follow-up anyone wants to

20  make?

21          MS. CORDES:  No, Your Honor, not for the Government.

22          MR. MOSS:  No, Your Honor.

23          THE COURT:  All right.  Thank you very much.  You may

24  step down.

25          THE WITNESS:  You bet.

1        MS. CORDES:  The second witness, Your Honor, the United

2   States calls is Special Agent Debra Michaels.  I believe she's

3   sitting outside.

4                DEBRA MICHAELS, GOVERNMENT'S WITNESS, SWORN

5                            DIRECT EXAMINATION

6   BY MS. CORDES:

7   Q.  Can you please introduce yourself to the courtroom?

8   A.  I'm Debra Michaels, Special Agent with the Federal Bureau of

9   Investigation.

10  Q.  And where do you work for the FBI?

11  A.  In Dallas, Texas.

12  Q.  And where -- what squad are you assigned in Dallas?

13  A.  I work cyber computer crimes.

14  Q.  As part of your work on the Cyber Crime Unit also involve

15  cases of child exploitation?

16  A.  Yes.

17  Q.  And how did you become involved with the case against Todd

18  Barkau, *United States vs. Todd Barkau*?

19  A.  I was requested by the Kansas City division to assist in an

20  interview.

21  Q.  And is that typical protocol for you to attend an interview

22  where an agent's flying in from another city?

23  A.  Yes.

24  Q.  And what interview were you requested to assist with?

25  A.  Interview of Debra Palmer.

1  Q.  And who is Ms. Palmer?

2  A.  She's located in the gray sweater.

3  Q.  How is she related to the case?  Is she the relative of

4  anyone involved in the case?

5  A.  She is the mother of the victim.

6  Q.  And did Ms. Palmer also live in the same residence of the

7  victim at the time the criminal offenses were committed?

8  A.  Yes.

9  Q.  And did you believe at that time that you were assisting with

10  a target interview or an interview with a witness?

11  A.  Basically a witness interview.

12  Q.  At the time you were assisting Special Agent Peterson, did

13  you believe that you were interviewing a defendant when you

14  approached the house?

15  A.  No.

16  Q.  And is the interview that you agreed to assist with, was it

17  on April 29th, 2008?

18  A.  Yes.

19  Q.  And where was it located in Dallas?

20  A.  It was at an apartment in Dallas, Texas.

21  Q.  Is that where Ms. Palmer resided?

22  A.  Yes.

23  Q.  And who did you come with to the apartment complex?

24  A.  Special Agent Brad Peterson.

25  Q.  Anyone else?

1  A.   No.

2  Q.   And what were you wearing when the two of you arrived?

3  A.   Business clothes, similar to what I'm wearing now.

4  Q.   No law enforcement gear, SWAT clothing?

5  A.   No.

6  Q.   And were you driving a marked vehicle or an unmarked vehicle?

7  A.   Unmarked.

8  Q.   So, there was no insignia that indicated it was law

9  enforcement on the outside?

10  A.   No, none of our vehicles have that.

11  Q.   And approximately, what time did you arrive at her apartment?

12  A.   Around 7:00 p.m.

13  Q.   And why did you arrive at that time?

14  A.   She was supposed to get off work at 8:00, and we just wanted

15  to be there earlier in case she got off early.

16  Q.   And what does Ms. Palmer do?

17  A.   She is a certified EMT.

18  Q.   And when you arrived at 7:00 p.m., was Ms. Palmer home?

19  A.   No.

20  Q.   What about at 8:00 p.m.?

21  A.   No.

22  Q.   And so, what did you and Special Agent Peterson do at that

23  time?

24  A.   We waited for her to come home from work.

25  Q.   And what was the purpose of waiting that evening as opposed

1  to doing the interview at a later date?

2  A.  For Special Agent Peterson, he had flown in for one day, and

3  so, we just assumed she would be home shortly thereafter.

4  Q.  And so, you continued to wait outside the residence?

5  A.  Yes.

6  Q.  Approximately, what time did Ms. Palmer arrive at the

7  residence?

8  A.  Approximately, 11:00 p.m.

9  Q.  And how do you know that?

10 A.  We had gone -- we had taken a bathroom break and maybe gone

11 ten or fifteen minutes.  We left at about 11:00, and we weren't

12 gone more than ten or fifteen minutes.

13 Q.  And when you returned ten or fifteen minutes later, was Ms.

14 Palmer home then?

15 A.  Yes.

16 Q.  And how did you know?

17 A.  Her vehicle was there, and the lights in the apartment were

18 turned on.

19 Q.  Had her vehicle previously been there?

20 A.  No.

21 Q.  And so, she had driven home?

22 A.  Yes.

23 Q.  And after you realized that she had arrived at her residence,

24 how did you approach her apartment?

25 A.  Initially, Special Agent Peterson called on her home phone to

1  see if she would answer and tell her that we were at the door.

2  She did not answer, so we knocked on the door, waited for her to

3  answer.

4  Q.  And did she answer the door?

5  A.  Yes, she did.

6  Q.  And what did you do when she answered the door?

7  A.  Special Agent Peterson introduced himself and me and showed

8  him -- showed her his credentials.

9  Q.  And so, you notified her that you were with the FBI?

10 A.  Yes.

11 Q.  And at that time, did you tell her that she was under arrest?

12 A.  No.

13 Q.  To the contrary, did you tell her that she was not under

14 arrest?

15 A.  No.

16 Q.  You didn't tell her --

17 A.  Oh, told her -- once she invited us in and we told her --

18 Q.  Okay.

19 A.  -- the purpose of the interview, then Special Agent Peterson

20 told her she was not under arrest.

21 Q.  Okay.  So, she invited you inside the apartment?

22 A.  Yes.

23 Q.  And she was told that she was not under arrest at that time?

24 A.  Yes.

25 Q.  Was she told that she would that she would be --

1      MR. MOSS:  Judge, I'm going to object to the leading

2  nature at this point.

3      THE COURT:  Sustained.  Sustained.

4  BY MS. CORDES:

5  Q.  Okay.  Let me ask you this.  At any point when you arrived

6  inside the apartment complex, was Ms. Palmer told she was placed

7  under arrest?

8  A.  No.

9  Q.  Okay.  Did anyone tell her that she'd be placed under arrest

10  at the conclusion of the interview?

11  A.  No.

12  Q.  And after being told that, did she agree to talk with you

13  that evening?

14  A.  Yes.

15  Q.  And where did you talk with her?

16  A.  In her apartment.

17  Q.  Approximately where?  Were you --

18  A.  Specifically, we talked to her for briefly in the kitchen

19  because she was making her lunch for the next day.  And then we

20  moved to the living room and sat down in the living room.

21  Q.  And when you first arrived in the apartment, was there any

22  indication that Ms. Palmer was intoxicated?

23  A.  No.

24  Q.  Did she smell intoxicated to you?

25  A.  No.

1  Q.  Did she look intoxicated?

2  A.  No.

3  Q.  Was she asked if she had been drinking?

4  A.  Yes.

5  Q.  And what was her response?

6  A.  No.

7  Q.  When you looked around the apartment, did you see any alcohol

8  inside the residence?

9  A.  No.

10  Q.  Was Ms. Palmer asked if she was on any drugs that evening?

11  A.  Yes.

12  Q.  And what was her response?

13  A.  Ibuprofen.

14  Q.  Anything else besides ibuprofen?

15  A.  Not to my knowledge.  She explained a medical condition but

16  didn't speak of any medication that she was taking for that

17  condition.

18  Q.  What was her medical condition?

19  A.  Fibromyalgia.

20  Q.  Anything that would have, in your opinion, impaired her

21  mental ability to answer questions that evening?

22  A.  No, and I asked her specifically that.

23  Q.  And what did she say?

24  A.  She said she was fine to talk with us.

25  Q.  And when you were talking with her, did she seem to

1  understand your questions?

2  A.  Yes.

3  Q.  Did she seem to respond normally and comprehend them?

4  A.  Yes.

5  Q.  Approximately, how long did the interview last?

6  A.  Approximately, two hours.

7  Q.  At any time during the course of that interview, could Ms.

8  Palmer have stopped the interview?

9  A.  Yes.

10 Q.  And you and Special Agent Peterson would have left at her

11 request?

12 A.  Yes.

13 Q.  Did she do that at any time during the interview?

14 A.  No.

15 Q.  At any point did she ask you to leave?

16 A.  No.

17 Q.  During the course of the interview, did Ms. Palmer ever ask

18 you for an attorney?

19 A.  No.

20 Q.  Did Ms. Palmer, in the course of the interview, ever ask --

21         MR. MOSS:  I'm going to object to leading again.

22         THE COURT:  Sustained.  And you're going to have to

23 object to the specific questions.

24         MR. MOSS:  Okay.

25         THE COURT:  But I think most of them have been leading.

1              MR. MOSS:  I'll do that.

2   BY MS. CORDES:

3   Q.  Let me phrase it this way, Special Agent.  Did Ms. Palmer ask

4   for an attorney?

5   A.  No.

6   Q.  Did she ask you if you she needed an attorney?

7              MR. MOSS:  Objection, leading?

8              THE COURT:  Sustained.

9   BY MS. CORDES:

10  Q.  During the course of the interview, did Ms. Palmer ever

11  mention an attorney?

12             MR. MOSS:  Judge, objection.  Still leading.

13             THE COURT:  Sustained.

14             MS. CORDES:  All right.  I'm going to move on.

15             THE COURT:  All of these questions call for yes or no

16  answers.  You just need to ask the what, when, why kinds of a

17  questions.

18             MS. CORDES:  Okay.

19  BY MS. CORDES:

20  Q.  Let me ask you this.  When you're inside the apartment

21  complex -- let me come back to that.  Let me ask you this.  When

22  you're inside the apartment, was Ms. Palmer able to move around

23  freely?

24  A.  Yes, she was.

25  Q.  Did she walk around the apartment?

1  A.  Yes, she went to the bathroom.

2  Q.  In what way?

3  A.  She went to the bathroom.

4  Q.  What types of other things did she do inside the apartment?

5  A.  She got a drink of water in the kitchen.

6  Q.  You testified before that she was making her lunch.

7  A.  Yes, she was peeling an orange.  She had the Tupperware out,

8  and that was what appeared to have been going on when we arrived

9  at the apartment.

10  Q.  All right.  At the conclusion of the interview, was Ms.

11  Palmer placed under arrest?

12  A.  No.

13  Q.  Please describe the discussion that took place at the very

14  end of the interview prior to you and Special Agent Peterson

15  leaving?

16  A.  At the very end of the interview, I asked her if there was

17  any questions that she had of me and that if there's anything

18  that I could answer for her.  And she asked me do I need an

19  attorney?  And I told her that I couldn't provide legal advice.

20  Q.  Did she anything to that effect in the course of the

21  interview?

22  A.  No.

23          MS. CORDES:  Nothing further at this time, Your Honor.

24                      CROSS-EXAMINATION

25  BY MR. MOSS:

1   Q.   Good afternoon, Agent Michaels.

2   A.   Afternoon.

3   Q.   What did you know about the case prior to assisting Agent

4   Peterson with this interview?

5   A.   That it was an investigation about a website that the victim

6   was involved in and an individual named Todd Barkau was involved

7   in, and that Kansas City division believed that the victim's

8   mother, Debra Palmer, could have some information that could be

9   of assistance to the investigation.   It appeared preliminary --

10  at the beginning of the case or they were just gathering

11  information.

12  Q.   And the basis of your information, was that conveyed to you

13  from Agent Peterson or another agent or did you review case

14  files?   How did you come about that information?

15  A.   From Agent Peterson.

16  Q.   And was that provided when he arrived in Dallas or was it

17  provided prior to him traveling to Dallas?

18  A.   It was primarily provided after he arrived.

19  Q.   So, is this the first time you met Agent Peterson?

20  A.   Yes, it is.

21  Q.   So, you're there to assist him in this interview, and

22  sometime prior to going out to speak to Ms. Palmer, he kind of

23  gives you a summary of what the case is about?   Is that a fair

24  statement?

25  A.   Yes.

1  Q.  How long did you speak with Agent Peterson prior to traveling

2  to Ms. Palmer's apartment?

3  A.  It's approximately a 20-minute drive.

4  Q.  All right.  Did you talk about the case while you were

5  waiting for Ms. Palmer to arrive?

6  A.  Somewhat, yes, we did.

7  Q.  And were you aware of any allegation that she was involved in

8  the commission of this offense, such as involved in creating the

9  website or encouraging the victim, her daughter, to be involved

10 in this website?

11 A.  No.  My primary role was to be a witness to the interview.

12 Q.  All right.  And I guess my question is did you have any

13 information that Ms. Palmer was involved in the offense as

14 opposed to simply being a witness to the offense or potential

15 witness to the offense?

16 A.  I didn't have information.  It was just my understanding that

17 she would have some information about the case that could assist

18 in the investigation.

19 Q.  Okay.  You didn't have any information that she was suspected

20 of being involved in the commission of the offense?

21 A.  Not specifically, no.

22 Q.  Well, all your information would come from Agent Peterson,

23 right?

24 A.  Yes.

25 Q.  And you had -- did you have any knowledge or information that

1  the daughter had been recording phone conversations that she'd

2  had with Ms. Palmer?

3  A.  Agent Peterson did mention that to me but did not mention the

4  context of the conversations.

5  Q.  And is that the fact that you'd be secretly recording phone

6  or would have someone secretly recording phone conversations with

7  another person, is that typical of a witness or does that sound

8  more like a potential defendant or target of an investigation?

9  A.  That's their investigation that they're conducting.  I wasn't

10  aware of what they were doing or why they were doing that.  I was

11  basically a witness to this interview.  And the questions I asked

12  were not specific towards anything about the investigation.

13  Q.  I understand.  But I'm just asking you, you've worked in

14  cyber crimes and you've been an agent for how many years?

15  A.  Five.

16  Q.  Okay.  And my question to you is just based on your

17  experience, is that typical to secretly record phone

18  conversations of a potential witness?  Have you ever done that?

19  A.  I have never done that myself in the five years that I've --

20  Q.  Do you know any other agent that's done that?

21  A.  Yes.

22  Q.  Just for witnesses?

23  A.  Yeah, I mean, preliminary, in the beginning of the

24  investigation, they could be witnesses, they could turn into

25  suspects.  That's just part of a good investigation.

1  Q.  Okay.  Did you take notes of the -- you state the interview

2  lasted about two hours?

3  A.  Yes.

4  Q.  Okay.  Do you recall what time you arrived, you actually went

5  into Ms. Palmer's apartment?

6  A.  Approximately 11:15.

7  Q.  And you recall about what time you left the apartment?

8  A.  I know 1:00.  I remember looking at 1:00.  And then that was

9  about the time we were wrapping it up.

10 Q.  Okay.  So, according to your memory, about an hour and 40 --

11 the interview lasted about an hour and 45 minutes?

12 A.  My recollection was two hours.  So, maybe 1:15.  I just

13 remember two hours -- at the end of two hours.

14 Q.  Did you take notes during the interview?

15 A.  No, Agent Peterson took all the notes.

16 Q.  And did you participate in the interview?

17 A.  I did ask questions.

18 Q.  What sorts of questions did you ask of Ms. Palmer?

19 A.  I specifically asked her if she was on any medication or

20 under --or if she had any alcohol, if she had any history of

21 mental illness, things that would -- it's a standard question

22 that I ask to make sure that the person that I'm talking to or

23 that we're talking to is of sound mind and capable of answering

24 our questions.

25 Q.  Okay.  I assume those would have been asked at the beginning

1  of the interview, is that right?

2  A.  They were because I asked -- or Agent Peterson had asked her

3  why she hadn't come home right after work, right after 8:00, and

4  she said she had stopped off with some friends to play -- with

5  some girlfriends of hers to play pool, which I know that after

6  that I interjected and said, had you been drinking.  And then I

7  asked all the questions, had you been drinking, are you under any

8  medication.  Her answer to the had you been drinking was no, and

9  then she immediately went into her medical condition and

10 explained that to me.

11 Q.  Did you ascertain where she had been playing pool, whether or

12 not -- was it a bar or pool hall?

13 A.  She didn't say specifically.

14 Q.  All right.  Do you recall yourself or Agent Peterson telling

15 her that you were looking for her assistance in the

16 investigation?

17 A.  That we wanted to talk to her about any ongoing investigation

18 is what I recall being said to her.

19 Q.  And do you remember the name Todd Barkau being mentioned to

20 her?

21 A.  Yes.

22 Q.  Do you know if she was informed that you were interested in

23 her as a potential witness to this potential crime?

24 A.  Yes, we said that we believed she had some information about

25 Mr. Barkau.

1   Q.   All right.   And was she informed that she was not going to be

2   arrested, is that right?

3   A.   Yes.

4   Q.   And is that you or Agent Peterson that informed her of that?

5   A.   Agent Peterson did that, and it was to -- also to put her at

6   ease, not only that it would be something standard, but to put

7   her at ease and make her feel comfortable knowing the FBI was at

8   her house, and she was a little bit nervous.

9   Q.   And I assume that's a pretty typical response for a person

10  being nervous when the FBI arrives at the doorstep late at night?

11  A.   Yes.

12  Q.   In your view, did Ms. Palmer make any comments about her work

13  schedule that day?   Do you know how long she had worked?

14  A.   Yes, she said she had worked since 8:00 that morning.

15  Q.   And did she mention a 14- or a 12-hour shift to you?

16  A.   She said she did work 12-hour shifts or 14-hour shifts

17  regularly.

18  Q.   Okay.   Did she appear fatigued to you after working this

19  particular shift?

20  A.   She didn't appear to be fatigued, but she did mention that

21  those are long hours for her.

22  Q.   What was she wearing when she answered the door?

23  A.   A blue outfit.

24  Q.   Do you know if it was clothing or was it pajamas or?

25  A.   It was clothing.

1  Q.  And I know you mentioned at the very -- you didn't take any

2  notes, correct?

3  A.  Correct.

4  Q.  But you do recall at the conclusion of the interview, Ms.

5  Palmer did ask about an attorney?

6  A.  Yes, when I asked her if she had any questions that I could

7  answer for her.

8  Q.  And she said that she needed an attorney?  Was that her

9  question or what do you recall her exact question was?

10  A.  Yes, she was -- yes, and the context of the question was she

11  was looking for guidance from me.

12  Q.  And your response was?

13  A.  I couldn't provide --

14  Q.  Answer that question.

15  A.  Yes.

16  Q.  All right.  Did you have a chance to -- you didn't prepare a

17  302 Report following this interview with Ms. Palmer?

18  A.  No, only one agent does that.

19  Q.  And that agent would have been Agent Peterson?

20  A.  Yes.

21  Q.  And it's fair to say he took the lead during the questioning

22  of Ms. Palmer?

23  A.  Yes.

24  Q.  Did you have a chance to review the report that he prepared?

25  A.  Yes.

1   Q.   And how did that process work?  Did he send it to you and you

2   review it and tell him it's okay?

3   A.   Yes.  And I sign it.

4   Q.   Okay.  So, he sends a copy to you, and then you sign it and

5   send him electronic or e-mail him or fax it to him?

6   A.   Yes.  He initially sent it to me electronically to review it

7   and then sent me a hard copy.

8   Q.   All right.  And the electronic version he sends you, do you

9   sign it?

10  A.   No.

11  Q.   I guess the reason I ask is the copy I have it looks like it

12  has your signature on it.  Do you know, did you initial it?

13  A.   Yes, the hard copy.

14  Q.   So, once it's all final, that's when you initial it?

15  A.   Yes.

16  Q.   But before it's final and before you initial it, did you have

17  an opportunity to review it for errors or omissions, things of

18  that nature?

19  A.   Yes.

20  Q.   All right.  And in his 302 report, you would agree there was

21  no mention of this comment at the end of the interview regarding

22  Ms. Palmer needing an attorney?

23  A.   Correct.

24  Q.   Okay.  Why did you not -- I mean, since you specifically

25  recall her asking about it, why didn't you communicate that to

1  Agent Peterson that that occurred?

2  A.  We just do a summary of the interview and not every detail is

3  mentioned.  She did not ask me for an attorney.  She asked me for

4  guidance into whether she should get an attorney or not.  And to

5  me it was not significant.

6  Q.  You would agree, however, that when a witness or potential

7  suspect, once we start talking about attorneys and requesting

8  attorneys, that is kind of, I don't know if I'd call it a touchy

9  issue, but that is a significant issue sometimes in particular

10  cases, right?

11  A.  Yes, and specifically that's not the case.  She was asking me

12  for future guidance.  I said to her specifically, do you have any

13  questions for me before I leave?  She was asking me for future

14  guidance, and I said I couldn't give that to her.

15  Q.  So, in your view, her request or her inquiry regarding future

16  guidance was not a significant factor to be included in the

17  report of the interview?

18  A.  No, because I gave none, no guidance.

19  Q.  Okay.

20        MR. MOSS:  I think that's all the questions I have.

21  Thank you.

22        THE COURT:  Anything further?

23        MS. CORDES:  No, Your Honor.

24        THE COURT:  Thank you very much.  You may step down.

25  All right.  Does the Government have any other witnesses?

1      MS. CORDES:  No, Your Honor.

2      THE COURT:  And, Mr. Moss, do you have any witnesses?

3      MR. MOSS:  No, Your Honor.

4      THE COURT:  There's been reference made to the two --

5  the initial interview and that report prepared on May 5th and

6  then the subsequent follow-up phone call.  I think both of those

7  302s are attached as Exhibits "A" and "B" for the Government's

8  Response to the Motion to Sever, which is filed under seal.  Is

9  there any objection to the Court, you know, considering those on

10 these, on this issue as well, I mean, only because there's been

11 reference made to it in the --

12     MS. CORDES:  No, Your Honor.  Those are the only two

13 reports that have been prepared, and they're both included on

14 that -- those pleadings as well.

15     MR. MOSS:  I don't have any objection to the Court

16 considering those, Your Honor.  There are some modifications.  I

17 think that Ms. Cordes did make the modifications in the context

18 of maybe suggested redactions.  I don't think they're significant

19 to the issues involved in this case.

20     THE COURT:  I guess maybe I hadn't read them enough to

21 know that there were redactions in them.

22     MR. MOSS:  They're just a -- I don't know if they're

23 redactions.  There's a few.

24     MS. CORDES:  I believe actually on that particular

25 pleading, Your Honor, I attached -- I'll have to double check --

1  but I attached the raw 302s as they were and the proposed

2  redactions, so they could be compared.  And actually, even if you

3  only have the ones that were highlighted for the redactions,

4  they're just highlighted.  So, if you set aside the blue and the

5  yellow colors going on, you can use them for purposes of this.

6  They're  --

7          THE COURT:  And I don't know that we need them, but it's

8  just that since reference has been made to them, I mean, you all

9  were talking about, you know, sentence 3 at the bottom of page 6.

10 I'll probably go back as I read the transcript and look at that

11 paragraph, and I just wanted to make sure that I had the right

12 documents.  And I think you're right.  It is color-coded, but

13 obviously, that wouldn't have any, you know, impact on -- I

14 didn't think there was anything actually taken out.

15         MS. CORDES:  There is nothing removed.  There are a

16 couple -- a few words that have a strike through, but they're

17 still readable.  And I am also happy to provide the Court with a

18 non-highlighted copy.

19         MR. MOSS:  I don't have a problem with the highlights,

20 Your Honor, and --

21         MS. CORDES:  I don't think I have -- there's nothing in

22 those that --

23         MR. MOSS:  Well, let me show you for example.

24         MS. CORDES:  Oh, I see what you're saying.

25         MR. MOSS:  Judge, I'm just pointing it out for the

1  record, but I don't think it matters one way or the other if the

2  Court relies on those documents --

3          THE COURT:  And obviously, --

4          MR. MOSS:  -- for those issues.

5          THE COURT:  -- when the Court prints it out, I'm not

6  even sure the highlighting shows up.

7          MS. CORDES:  Will show.  And just to be safe, Your

8  Honor, I'll just run down -- or run up a copy that doesn't have

9  any highlighting on it.  That way you can have it available to

10 you if you want to look at it that way.  The copies I have right

11 now also have highlighting on them, so.

12         THE COURT:  Well, I guess, then we get into if you give

13 me separate copies.  I mean, this is already part of the record.

14 I mean, no one introduced them.  Do you intend to introduce them

15 today?

16         MS. CORDES:  I don't believe it's necessary, Your Honor.

17         MR. MOSS:  Judge, I didn't mark them, but I don't have

18 any objection to the Court considering them.  I was just pointing

19 that out just so --

20         THE COURT:  Right.

21         MR. MOSS:  -- just for the record, but.

22         THE COURT:  Well, my concern is just if we start having

23 other copies provided, then I think we're going to have to mark

24 them as exhibits and introduce them here.  And I just wanted to

25 let the parties know that for purposes of reading the record,

1    when you make reference to the 302s, I'm just going to use these

2    other Exhibits "A" and "B" to put the reference in context.

3                MS. CORDES:  And, Your Honor, --

4                MR. MOSS:  And the portions that -- excuse me.  The

5    portions I referred to didn't have anything to do with the

6    highlights --

7                MS. CORDES:  Right.

8                MR. MOSS:  -- or the changes, so it won't matter.

9                MS. CORDES:  That's what I was going to say.

10               THE COURT:  All right.  Anything else?

11               MR. MOSS:  No, Your Honor.

12               MS. CORDES:  Not from the Government, Your Honor.  Thank

13   you.

14               THE COURT:  All right.  We'll be in recess.

15                    (Court Adjourned at 2:42 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2                         **INDEX**

3

4  **WITNESSES FOR**
   **THE PLAINTIFF:**       **DIRECT**      **CROSS**        **REDIRECT**   **RECROSS**

5  Brad Peterson           3              14               32/35          34
   Debra Michaels          38             47

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7          I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
8   above-entitled matter.

9

10          /s/ Lissa C. Whittaker        February 9, 2009
           Signature of transcriber              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25