IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-00113-02-CR-W-NKL |
| ) | |
| DEBRA PALMER, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Palmer's Motion to Suppress Statement (doc #46). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On May 7, 2008, the Grand Jury returned a seven count indictment against defendants Todd B. Barkau and Debra Palmer. Defendant Palmer was charged in Counts One and Four. Count One charged that from January 1, 2000, to February 20, 2005, defendants Barkau and Palmer, aiding and abetting each other and others, engaged in commercial sex trafficking of a child. Count Four charged that from January 1, 2002, to February 20, 2005, defendants Barkau and Palmer, aiding and abetting each other and others, as a parent, legal guardian, and persons having custody and control of a minor, knowingly permitted the child to engage in sexually explicit conduct for production of visual depictions.

On February 26, 2009, the Grand Jury returned an eight count superseding indictment against defendants Todd B. Barkau and Debra Palmer. Defendant Palmer is charged in Counts One, Two and Five of the superseding indictment. Count One charges that from January 1, 2000, to February

20, 2005, defendants Barkau and Palmer, aiding and abetting each other and others, engaged in commercial sex trafficking of a child. Count Two charges that from January 1, 2002, to February 20, 2005, defendants Barkau and Palmer, aiding and abetting each other and others, as a parent, legal guardian, and person having custody and control of a minor, offered to sell and transfer custody of the minor with knowledge of resulting sexual exploitation. Count Five charges that from January 1, 2002, to February 20, 2005, defendants Barkau and Palmer, aiding and abetting each other and others, as a parent, legal guardian, and persons having custody and control of a minor, knowingly permitted the child to engage in sexually explicit conduct for production of visual depictions.

On February 4, 2009, an evidentiary hearing was held on defendant Palmer's motion to suppress. Defendant Palmer was represented by Assistant Federal Public Defender Stephen C. Moss. The Government was represented by Assistant United States Attorney Cynthia L. Cordes. The Government called Special Agents Brad Peterson and Debra Michaels of the Federal Bureau of Investigation as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. FBI Special Agent Brad Peterson has been the case agent involved in this investigation from the commencement of the case. (Tr. at 3) Special Agent Peterson is part of the FBI's Cyber Squad and he works on child exploitation cases. (Tr. at 3) Defendant Palmer is the mother of the primary victim in the case and she lived in the home at the time the offenses were allegedly committed. (Tr. at 4)

2. Special Agent Peterson traveled from his office in Kansas City to Dallas, Texas for the purpose of interviewing Ms. Palmer. (Tr. at 4-5) The aim of the interview was to get any information that Ms. Palmer might have about the activities Special Agent Peterson was investigating. (Tr. at 4) Special Agent Peterson testified that at the time of the interview, Ms. Palmer was a potential witness in the investigation against Todd Barkau, rather than a target of the investigation herself. (Tr. at 4) On cross-examination, Special Agent Peterson testified that the victim had made some

2

allegations against her mother, Ms. Palmer, and Special Agent Peterson was also following up on those allegations. (Tr. at 17-18) Prior to his trip to Dallas, Special Agent Peterson had equipped the victim with a recording device so that she could record phone conversations with Ms. Palmer. (Tr. at 19) Special Agent Michaels testified that she has known of other instances where phone conversations of a potential witness have been secretly recorded and she considers this to be part of a good investigation. (Tr. at 50) Special Agent Michaels further testified that people considered witnesses in the beginning of an investigation can later turn into suspects. (Tr. at 50)

3. Special Agent Peterson testified that it is standard procedure for an agent to take someone else along when an interview is conducted. (Tr. at 5) Special Agent Debra Michaels from the Dallas division office accompanied Special Agent Peterson to Ms. Palmer's apartment on April 29, 2008. (Tr. at 5, 19) Since Special Agent Michaels has experience in child exploitation cases, she was selected to accompany Special Agent Peterson. (Tr. at 5) The agents, dressed in business attire, arrived at Ms. Palmer's apartment in an unmarked vehicle at approximately 7:00 p.m. (Tr. at 6, 40) The agents had information that Ms. Palmer would be getting off work at 8:00 p.m. (Tr. at 6, 40) Ms. Palmer works as a certified EMT for an ambulance company. (Tr. at 6, 40) The agents arrived at Ms. Palmer's apartment ahead of that time in case she came home early. (Tr. at 6, 40) The agents did not have an appointment with Ms. Palmer. (Tr. at 36) Special Agent Peterson testified that he did not make an appointment because he did not want Ms. Palmer to contact her daughter and attempt to persuade her to change her testimony. (Tr. at 36)

4. The agents waited in Ms. Palmer's parking lot until about 11:00 p.m. when they left for a restroom break. (Tr. at 7, 41) The agents chose to wait, rather than come back the next day, because Special Agent Peterson had flown into Dallas for one day for the sole purpose of this interview. (Tr. at 7, 41) When the agents returned from their break at approximately 11:15 p.m., Ms. Palmer's car was in the parking lot and the lights in the apartment were turned on. (Tr. at 7, 41) Special Agent Peterson attempted to call Ms. Palmer so that she would not be alarmed by someone knocking on her door, but she did not answer the phone. (Tr. at 8, 41-42)

5. Special Agents Peterson and Michaels knocked on Ms. Palmer's door and identified themselves as agents with the FBI. (Tr. at 8, 42) Special Agent Peterson told Ms. Palmer that he was investigating a matter that he believed she might have some information about and wondered if he and Special Agent Michaels could come in and talk with her. (Tr. at 8) Ms. Palmer invited the agents inside her home. (Tr. at 8, 42) Special Agent Peterson testified that he told Ms. Palmer he was investigating allegations her daughter had made against Todd Barkau. (Tr. at 15-16) Special Agent Peterson did not communicate to Ms. Palmer that he believed she was also involved based on allegations made by her daughter. (Tr. at 19) Special Agent Peterson told Ms. Palmer that the agents just wanted to talk with her and that they were not there to arrest her or take her into custody. (Tr. at 8-9, 42) Special Agent

3

Peterson wanted to make sure that Ms. Palmer understood that this was a non-custodial situation. (Tr. at 16) Ms. Palmer was not read a <u>Miranda</u> warning because she was not in custody or under arrest. (Tr. at 31)

6. Before Special Agent Peterson began interviewing Ms. Palmer, he asked her if she had taken any medication that evening. (Tr. at 9, 44) Ms. Palmer informed the agents that she had taken a couple of ibuprofen and that she was not affected by the medication. (Tr. at 9, 44) Ms. Palmer told the agents she suffered from fibromyalgia, but did not indicate that she had taken medication for this condition. (Tr. at 44) Special Agent Peterson testified that he did not see any medication or drugs in the apartment. (Tr. at 9-10)

7. The agents asked Ms. Palmer where she had gone after work and she said she had stopped to play some pool. (Tr. at 36, 52) Special Agent Michaels asked Ms. Palmer if she drank any alcohol that evening. (Tr. at 10, 52) Special Agent Peterson testified that Ms. Palmer either stated that she had not or it was so minimal that he believed it was not an issue. (Tr. at 10) Special Agent Michaels testified that Ms. Palmer stated she had not been drinking. (Tr. at 52) Special Agent Peterson's report does not mention any inquiry about alcohol. (Tr. at 28) Special Agent Peterson testified that if Ms. Palmer had listed specific alcoholic drinks she had consumed that evening, he would have included that information in his report. (Tr. at 35) Both Special Agent Peterson and Special Agent Michaels testified that Ms. Palmer did not appear to be intoxicated. (Tr. at 10, 43-44) Special Agent Peterson further testified that he did not see any alcohol as he looked around the apartment. (Tr. at 10)

8. Ms. Palmer was interviewed for approximately two to two and one-half hours. (Tr. at 11, 51) Ms. Palmer seemed to understand the questions she was asked and responded coherently. (Tr. at 11, 44-45) She did not appear to be disorientated or confused during the questioning. (Tr. at 28) While Ms. Palmer may have mixed together some of events she was describing, Special Agent Peterson testified that this was understandable given that the events described had occurred four or five years earlier. (Tr. at 29) The questioning was conversational in tone. (Tr. at 22) While Ms. Palmer initially denied certain things, such as that she had no knowledge that her daughter was sharing a bedroom with Todd Barkau, that her daughter was having a sexual relationship with Barkau and that her daughter was having live sessions with customers, she eventually admitted to them after Special Agent Peterson told her he did not believe her. (Tr. at 24-27) Special Agent Peterson testified that he considers some of the things Ms. Palmer said to be incriminating. (Tr. at 24) Special Agent Peterson also considers some of the things Ms. Palmer said to be self-serving statements. (Tr. at 32) Special Agent Peterson's report of this conversation is Attachment A to the Government's Response in Opposition to Defendant's Motion to Sever (doc #55).

9. During the course of the interview, Ms. Palmer never asked the agents to leave or requested that they come back on a different day. (Tr. at 11, 45) During the course

4

of the interview, Ms. Palmer never asked for an attorney. (Tr. at 11, 45) Ms. Palmer was 44 years old. (Superseding Indictment at 1) Years earlier, Ms. Palmer had faced charges for prostitution, dangerous drugs and insufficient checks. (Pretrial Services Report at 3)

10. During the course of the interview, Ms. Palmer was able to move freely around her home. (Tr. at 12, 46) When the agents first arrived, Ms. Palmer was preparing her lunch for the next day. (Tr. at 12) Ms. Palmer went ahead and finished that task before the interview began. (Tr. at 12) Later on, Ms. Palmer excused herself to use the bathroom. (Tr. at 12, 47) Both Special Agent Peterson and Special Agent Michaels testified that although Ms. Palmer had worked a long shift that day, she did not appear fatigued during the interview. (Tr. at 27, 53)

11. Special Agent Peterson did not make any promises to Ms. Palmer during the course of the interview. (Tr. at 12) He did not promise her that she would not be charged or that she would receive any type of leniency. (Tr. at 12)

12. At the conclusion the interview, Special Agent Peterson gave Ms. Palmer his business card and invited her to contact him if she had any additional information. (Tr. at 13) Ms. Palmer was not placed under arrest. (Tr. at 32-33, 47) The agents asked Ms. Palmer if she had any questions for them. (Tr. at 13, 47) Ms. Palmer asked the agents if she needed to get an attorney. (Tr. at 13-14, 47, 54) Special Agent Michaels told Ms. Palmer that she could not provide her with legal advice. (Tr. at 47, 54)

13. Ms. Palmer called Special Agent Peterson on May 2, 2008, and made additional statements during the course of that conversation. (Tr. at 14) Special Agent Peterson's report of this conversation is Attachment B to the Government's Response in Opposition to Defendant's Motion to Sever (doc #55).

### III. LEGAL ANALYSIS

Defendant Palmer seeks to suppress her statement made to FBI agents on April 29, 2008, as being obtained in violation of her rights under the Fifth Amendment. (Motion to Suppress Statement at 1) Specifically, defendant Palmer contends that her statement was involuntary based on the agents' failure to inform her of her Miranda rights, her individual traits and condition and the affirmative deception perpetrated by police regarding the nature of the investigation and her need for counsel during questioning. (Id. at 2)

The voluntariness of a confession is a question of law. See United States v. Jordan, 150

5

F.3d 895, 898 (8th Cir. 1998), cert. denied, 526 U.S. 1010 (1999).  The government must prove by a preponderance of the evidence that the challenged statements are voluntary.  See United States v. Astello, 241 F.3d 965, 966 (8th Cir.), cert. denied, 533 U.S. 962 (2001).  The totality of the circumstances, including conduct by law enforcement and the defendant's capacity to resist pressure, should be evaluated to determine whether or not a defendant's will was overborne.  See United States v. Gannon, 531 F.3d 657, 661 (8th Cir. 2008).

After Special Agent Peterson asked defendant Palmer if he could speak with her about a case he was investigating, Palmer invited the agents into her home.  (See Fact No. 5, supra)  Defendant Palmer contends that her statement was involuntary based on deception by the agents in that the agents did not inform her she was a suspect and that her daughter had recorded phone conversations between them.  Special Agent Peterson testified that at that time, Palmer was considered a potential witness in the investigation against Todd Barkau, rather than a target of the investigation herself. (See Fact No. 2, supra)  The Court is not persuaded by the prosecution's claim that defendant Palmer was not a target of the investigation and finds Special Agent Peterson's failure to inform Palmer that he was also following up on allegations that Palmer's daughter had made against her to be somewhat deceptive.  However, "a ... deception ... on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne."  United States v. Martin, 369 F.3d 1046, 1055 (8th Cir. 2004).  The Court finds that Special Agent Peterson's failure to inform Palmer that in addition to investigating Todd Barkau, he also was following up on allegations against Palmer, did not cause Palmer's will to be overborne when the interview is viewed in its entirety.

Contrary to the arguments made in defendant's briefing with respect to defendant's limited education and life experience and her lack of sophistication regarding her legal rights, the Court

6

notes that defendant Palmer was 44 years old and working as a certified EMT for an ambulance company. (See Fact Nos. 3 and 9, supra) Further, defendant Palmer was not entirely new to the legal system as she had previously faced charges for prostitution, dangerous drugs and insufficient checks. (See Fact No. 9, supra)

Contrary to the argument made in defendant's briefing that prior to any questioning, defendant Palmer asked the agents if she needed an attorney and they replied "no," the evidence presented at the hearing showed that at the conclusion of the interview, when the agents asked defendant Palmer if she had any questions for them, Palmer asked if she needed an attorney. (See Fact No. 12, supra) Again contrary to defendant's briefing, the agents did not tell Palmer that she did not need an attorney. Special Agent Michaels told Palmer that she could not provide her with legal advice. (Id.) The evidence presented at the hearing further showed that during the course of the interview, defendant Palmer never asked for an attorney. (See Fact No. 9, supra)

The tone between defendant Palmer and Special Agents Peterson and Michaels was conversational. (See Fact No. 8, supra) Defendant Palmer was able to move freely around her home and take breaks. (See Fact No. 10, supra) Contrary to the arguments made in defendant's briefing, there is no indication that defendant Palmer was impaired because of fatigue or alcohol consumption. Instead, evidence was presented that defendant Palmer told the agents that she had not been drinking. (See Fact No. 7, supra) Both Special Agent Peterson and Special Agent Michaels testified that defendant Palmer did not appear intoxicated or fatigued. (See Fact Nos. 7 and 10, supra) The agents testified that defendant Palmer seemed to understand the questions she was asked and responded coherently. (See Fact No. 8, supra) She did not appear to be disorientated or confused during the questioning. (Id.) Defendant Palmer never asked the agents to leave or requested that they come back on a different day. (See Fact No. 9, supra) Defendant Palmer

7

appeared so comfortable with the agents that several days after the initial interview, Palmer contacted Special Agent Peterson and made additional statements. (See Fact No. 13, supra)

There is no indication that defendant Palmer was in a physical or mental state which would have allowed her will to be overborne. Considering the totality of the circumstances, the Court finds that defendant Palmer's statement to the agents was voluntary.

As to defendant Palmer's argument that she should have been provided Miranda warnings, "[t]he basic rule of Miranda is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). Defendant Palmer did not receive Miranda warnings before making statements. (See Fact No. 5, supra) The government claims that no warnings were necessary because defendant Palmer was not in custody.

To resolve the Miranda issue, the Court must determine whether defendant Palmer was in custody during the interview. In United States v. Martin, 369 F.3d 1046 (8th Cir. 2004), the Eighth Circuit Court of Appeals set forth the following guidance with respect to the issue of whether an interrogation was custodial:

> To assess whether an interrogation was custodial, our court commonly uses six non-exhaustive indicia of custody. The presence of the first three indicia weighs against the existence of custody, while the presence of the latter three indicia supports the existence of custody. ... These indicia are:
>
> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police

8

dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

Martin, 369 F.3d at 1057.

Considering the totality of the circumstances, the Court finds that defendant Palmer's interview was non-custodial and, therefore, Miranda warnings were unnecessary. First, Special Agent Peterson told Palmer that the agents were not there to arrest her or take her into custody. (See Fact No. 5, supra) Second, Palmer was not physically restrained by the agents. During the interview, Palmer was able to move freely around her home, preparing her lunch for the next day and excusing herself to use the bathroom. (See Fact No. 10, supra) Third, Palmer voluntarily acquiesced to the FBI agents' requests to speak with her by inviting the agents into her home on April 29 and on May 2 by initiating contact with Special Agent Peterson. (See Fact Nos. 5 and 13, supra) Fourth, the agents did not use strong arm tactics during the interview. The tone of the questioning was conversational. (See Fact No. 8, supra) Fifth, the atmosphere of the interview was not police-dominated. Two agents interviewed Palmer in her own home. (See Fact No. 5, supra) Sixth, Palmer was not placed under arrest at the conclusion of the questioning, even after making incriminating statements. (See Fact Nos. 8 and 12, supra)

## IV. CONCLUSION

Upon examining the totality of the circumstances, the Court finds that the statement made by defendant Palmer on April 29, 2008 was not in violation of her constitutional rights. Therefore, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Palmer's Motion to Suppress Statement (doc #46).

9

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

           */s/ Sarah W. Hays*
           SARAH W. HAYS
           UNITED STATES MAGISTRATE JUDGE